UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

JOHN READ, THOMAS R. MCGREW JR.,
FRANCIS A. ANNUNZIATA and
SUZANNE ANNUNZIATA, individually
and on behalf of all others similarly situated,

**CLASS ACTION
COMPLAINT**

Plaintiffs,

Civil Action No.: _____

vs.

**TRIAL BY JURY DEMANDED**

CORNING INCORPORATED,
CORNING HOMES, INC. and JOHN DOES,

Defendants.

Plaintiffs, **JOHN READ, THOMAS R. MCGREW JR., FRANCIS A. ANNUNZIATA, AND SUZANNE ANNUNZIATA** ("Plaintiffs"), individually and on behalf of all others similarly situated (the "Class"), by and through their attorneys, Knauf Shaw LLP for their Complaint, state as follows:

## PRELIMINARY STATEMENT

1.      Plaintiffs bring this class action lawsuit on behalf of themselves and the owners, occupants, and residents of properties ("Properties") located in an area known as the "Houghton Plot" in the City of Corning, New York, more fully described below.

2.      This lawsuit is brought against Defendants Corning Incorporated ("Corning Inc.") and Corning Homes, Inc. ("Corning Homes"), who will be collectively referred to as "Corning."

3.      Corning deposited, released, and/or disposed of fill and other materials (together "Fill") containing ash, brick, and/or glass waste, which has been identified to contain concentrations of arsenic, cadmium, and lead (the "Contamination"), which are designated as "hazardous substances" under Section 102(a) of the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. § 9602 ("Hazardous Substances"), at

1

levels exceeding health-based standards and/or testing positive for characteristics of hazardous waste, thereby also rendering the Contamination "hazardous waste" under section 3001 of the Solid Waste Disposal Act, 42 U.S.C. § 6921, 40 C.F.R. §261.24 ("Hazardous Waste").

4.      Some or all of the Fill, including Hazardous Substances and Hazardous Wastes, which resulted in the Contamination, were generated by the industrial operations of Corning Inc.

5.      This action arises from the negligent or intentional Contamination of the Properties within Houghton Plot, and injuries to Properties with Hazardous Substances.  Such substances were deposited, released, and/or disposed within Houghton Plot, causing the Contamination, thereby proximately causing Plaintiffs to suffer damage to their Properties, interfering with their exclusive possession of their Properties, loss of the use and enjoyment of their Properties, loss of quality of life, and degradation of their neighborhood.

6.      The deposit, release, and/or disposal of Fill in Houghton Plot has contaminated the Class Area (as the term defined in Paragraph 117 below).

7.      Remedial measures are necessary to protect every Property in the Class Area from the Contamination.

8.      Plaintiffs seek an injunction requiring Corning to promptly and completely remove all Hazardous Substances and Contamination from their Properties and prevent future migration of Hazardous Substances onto their Properties.

9.      Plaintiffs also seek compensatory and punitive damages.

10.     The value of Properties owned by Plaintiffs and all other Property owners throughout the Class Area has been substantially diminished due to the Contamination caused by Corning.

11.     This lawsuit seeks to recover these lost Property values, costs Plaintiffs have incurred to protect themselves and their Properties' residents from the Contamination, and damages for loss of quality of life, as well as other damages.

12.     This lawsuit does not make claims for personal injuries.

13.     Corning has failed to adequately investigate and remediate the Contamination known to exist on Properties owned and/or occupied by Plaintiffs and others throughout the Class Area.

14.     Under the common law claims asserted in Causes of Action II, III, IV and V, Plaintiffs seek injunctive relief against Corning, specifically the entry of an Order which: (1) permanently restrains and enjoins Corning from allowing the Contamination from continuing to persist, or migrate on Plaintiffs' and other Class Area Properties; and (2) compels Corning to comprehensively remediate the Contamination it has caused at the Houghton Plot, on Plaintiffs' Properties, and on other Class Area Properties.

## THE PARTIES

15.     Defendant Corning Inc. is a domestic corporation, duly organized and existing under the laws of the State of New York, with its corporate headquarters located at 1 Riverfront Plaza, Corning, New York.

16.     Corning Inc. was formerly known as Corning Glass Works.

17.     Upon information and belief, Defendant Corning Homes is a dissolved or merged domestic corporation that formerly maintained corporate headquarters in Corning, New York, and was a predecessor or affiliate of Corning Inc.

18.     Upon information and belief, Defendants John Does are other persons that may be responsible for the Contamination but have not presently been identified, and which may share liability with Corning for the claims set forth in this Complaint.

19.     Upon information and belief Corning, or their predecessor in interest, owned and operated the land now known as the Houghton Plot as a landfill ("Facility") where they deposited, released, or disposed of the Contamination.

20.     Plaintiff John Read owns and resides at the Property located at 57 Pyrex Street, Corning, New York, which is located within the Houghton Plot.

21.     Mr. Read purchased his Property in November 2010.

22.     He currently resides at that Property with his wife.

23.     Mr. Read's home has six rental units, including the unit in which he and his wife currently reside.

24.     Each rental unit is currently occupied by tenant(s).

25.     Mr. Read has incurred costs in response to the Contamination, including purchasing top soil and bark, and raising his vegetable garden.

26.     Mr. Read has documented Hazardous Substances on his Property, which exceed New York State soil cleanup objectives ("SCOs") and/or other health-based standards.

27.     Mr. Read's enjoyment of his Property and quality of life have been diminished due to the Contamination.

28.     Plaintiff Thomas R. McGrew Jr. owns and resides at the Property located at 232 E. Pulteney Street, Corning New York, which is located within the Houghton Plot.

29.     Mr. McGrew purchased this Property in December of 2013.

30.     He currently resides at that Property with his wife and children.

31.     Mr. McGrew has discontinued all plans to expand the house on his Property and all activities which require excavation or digging.

32.     Mr. McGrew has documented Hazardous Substances on his Property, which exceed New York State health-based standards.

33.     Mr. McGrew's enjoyment of his Property and quality of life of been diminished due to the Contamination.

34.     Plaintiffs Francis A. Annunziata and Suzanne Annunziata reside at Property located at 42 Roosevelt Street, Corning New York, which is located within the Houghton Plot.

35.     The Annunziatas have documented Hazardous Substances on their Property, which exceed New York State health-based standards.

36.     Mr. Annunziata purchased their Property in May of 1995.

37.     The Annunziatas no longer plant anything in their yard due to the Contamination.

38.     They have also had to refrain their dogs from digging and playing in the yard.

39.     The Annunziatas also no longer allow their grandchildren to play in the yard.

40.     Previously the Annunziatas would take their dogs for walks near the Corning-Painted Post School District Property at or near 201 Cantigney Street in the City of Corning ("School Property"), but have ceased that activity due to concern about the Contamination.

41.     Even after Corning partly remediated the School Property, as discussed below, Contamination can still be found near the trees and other areas.

42.     The Annunziatas' enjoyment of their Property and quality of life of been diminished due to the Contamination.

43.     The unnamed members of the Class are owners, occupants, and/or residents of Properties located in the Class Area, and have sustained injuries and damages similar to those of Plaintiffs.

## JURISDICTION AND VENUE

44.     This Court has federal question jurisdiction over this matter pursuant to 28 U.S.C. § 1331, because this case arises under the laws of the United States of America; specifically, because Cause of Action I is predicated upon and seeks relief pursuant to CERCLA, 42 U.S.C. § 9607.

45.     This Court has supplemental jurisdiction over the claims arising under New York State law that are set forth in Causes of Action II, III, IV and V, pursuant to 28 U.S.C. § 1367, which are so related to the claims in Cause of Action I that they form part of the same case or controversy.

46.     This Court also has jurisdiction over this matter under 28 U.S.C. §1332(d)(2)(a), §1332(d)(3), and §1332(d)(4).  Jurisdiction is proper because the amount in controversy exceeds $5,000,000, and upon information and belief, some unnamed members of the Class are owners of Properties located in the Class Area, who reside outside the State of New York.

## GENERAL ALLEGATIONS

### A.  Overview of Houghton Plot.

47.     Many years ago, Corning deposited, released, and/or disposed of Fill containing ash, brick, and/or glass waste, which has been identified to contain concentrations of arsenic, cadmium, and lead exceeding SCOs and/or other health-based standards and/or testing positive for characteristics of Hazardous Waste within the Houghton Plot.

48.     The Class Area was previously farmland, which was later developed into the Houghton Plot.

49.     The Houghton Plot was previously owned by Corning Homes, which upon information and belief was a predecessor in interest to Corning, Inc., and acquired the land in 1920 from the heirs of the then-deceased founder of Corning Flint Glass Works.

50.     Many deeds for Properties within the Houghton Plot contain a condition that gave Corning Glass Works "the right and privilege of maintaining the structure, buildings, and ash dumps as now located" within the Class Area "free from any claim or alleged claims for damages by reason of the diversion of the flow of the waters of the Chemung River over or upon the lands…."

51.     No claim is made in this Class Action Complaint for diversion of the flow of the waters of the Chemung River.

52.     The Contamination was deposited, released, and/or disposed within the Houghton Plot, and may have even been used to improve drainage and to fill in low-lying areas in order to develop the neighborhood.

**B. Contamination Investigation.**

53.     On June 27, 2014, Corning entered into an Order on Consent, Index No. B8-0835-14-07 ("2014 Order") with the New York State Department of Environmental Conservation ("NYSDEC"), following discovery of Contamination at the School Property.

54.     NYSDEC designated portions of Houghton Plot as Operable Units ("OU") OU1, OU2, OU3 and OU4, and designated the area as the "Study Area," assigning it NYSDEC Site No. 851046.

55.     The Study Area within the Houghton Plot was bounded by Pyrex Street on the west, East Pulteney Street on the north, Post Creek on the east and the Chemung River on the south, and consists of approximately 180 acres of land, and includes the School Property, the Corning Christian Academy, the Memorial Stadium and field, the Corning Fire Department frontage, about 200 residences, a public park, and flood control areas along the Chemung River and Post Creek.

56.     The 2014 Order required Corning to implement a NYSDEC-approved Study Area Characterization Work Plan and conduct an environmental study to determine whether the Contamination was present within other parts of the Study Area, other than the School Property.

57.     Weston Solutions, Inc. was Corning's chosen environmental professional to carry out the 2014 Order.

58.     In order to carry out the requirements of the 2014 Order, Corning needed to gain access to residents' homes and conducti sampling.

59.     Upon information and belief, residents were sent access requests in July of 2014 by Corning, so that Corning could sample the Properties within the Study Area.

60.     Corning conducted a visual assessment of each Property that consented, and upon information and belief, took three to four samples, 2 inches below ground surface.

61.     NYSDEC and the New York State Department of Health ("NYSDOH") were to review the sampling results and determine if additional investigation or actions were required.

62.     Upon information and belief, sampling events took place in September of 2014.

63.     Upon information and belief, sampling results were first provided to some Property owners by letter dated February 12, 2015.

64.     Hazardous Substances, including arsenic, lead, and cadmium, were detected in many samples.  The Contamination was detected at levels exceeding health-based standards and

testing positive for characteristics of Hazardous Waste, thereby also rendering the Contamination a "hazardous waste" under section 3001 of the Solid Waste Disposal Act, 42 U.S.C. § 6921, 40 C.F.R. §261.24.

65.     Groundwater sampling had also been conducted in December 2014 within the Study Area: four on the Corning-Painted Post School District Property, two on the Memorial Stadium Property, and one in the residential area.

66.     As a result of the initial investigation, NYSDEC and NYSDOH requested additional surface soil sampling, which was to be performed in the spring of 2015.

67.     An area, now known as the "Expansion Area," that is immediately north and west of the Study Area and is bordered by Interstate Highway 86 to the north, Centerway to the west and Guthrie Medical Clinic to the south, also required investigation.

68.     NYSDEC initiated the Expansion Area characterization investigation in May 2015.

69.     Upon information and belief, Corning had initially refused to undertake the investigation of the Expansion Area, so NYSDEC had to do it.

70.     The Expansion Area includes roughly 150 more Properties.

71.     In early May 2016, Corning took over the investigation and sampling of the Expansion Area.

72.     Sampling results in the Expansion Area also detected designated Hazardous Substances, including arsenic, lead, and cadmium in many samples.  The Contamination was detected at levels exceeding health-based standards and/or testing positive for characteristics of Hazardous Waste, thereby also rendering the Contamination a Hazardous Waste.

**C. Selected Remedy.**

73.     In March of 2017, Corning prepared two Focused Feasibility Studies/Alternative Analyses ("FFS/AA"): one for the residential areas of the Study Area (OU1, OU2, and OU5), and one for the School/Community Use Areas (OU3).  Upon information and belief, no FFS/AA has been prepared for OU4.

*Residential Area Selected Remedy*

74.     The residential FFS/AA analyzed three alternatives: (1) no action; (2) excavate up to 2 feet and provide a soil cover, and (3) excavate up to 15 feet and backfill with clean soil.

75.     Alternative 2 was recommended in the FFS/AA, and announced as the selected remedy (the "Selected Remedy") in July 2017 by the issuance of a Decision Document by NYSDEC.

76.     The Selected Remedy includes the excavation, removal and replacement of soil from the top two feet of Properties with a demarcation layer, with "some flexibility."

77.     The stated "flexibility" allows for the Contamination to remain after the Selected Remedy has been implemented.

78.     The Selected Remedy also allows Corning to remove and replace the surface soil only at some Properties, and also remove and replace the top two feet of soil in some places without a demarcation layer.

79.     As part of the Selected Remedy, a Site Management Plan ("SMP") is required, by which institutional and engineering controls are required for the Study Area.

80.     The SMP would be a perpetual burden on all Properties within the Study Area.

81.     Under the State Superfund program – which is the authority the NYSDEC is operating under to mandate investigation and remedial requirements – the stated remedial goal is to "restore the site to predisposal conditions, to the extent feasible." 6 N.Y.C.R.R. §375-2.8

82.     The Study Area was previously farmland, and was developed into to a residential area after the Contamination was deposited.

83.     The Selected Remedy will not restore the area to predisposal conditions.

84.     Alternative 3 would require removal of essentially all of the Contamination down to 15 feet, except what is underneath existing structures, and would achieve the goal to "restore the site to predisposal conditions."

85.     Corning alleges that Alternative 2 is preferred to Alternative 3 because although deeper excavations are possible, they are not practicable, and allegedly provide no significant additional benefit to the protectiveness of human health.

86.     Corning found that in comparison to Alternative 2, Alternative 3 would result in more potential exposure during implementation, cause more disruption to the community for a longer period of time, impose a larger environmental footprint, require more complex construction when slope stabilization and shoring is needed around structures and subsurface utilities, and still would leave some residual constituents at concentrations greater than health-based standards.

87.     Importantly, Corning stated that Alternative 3 is less cost-effective than Alternative 2.

88.     The Selected Remedy is insufficient to protect public health and the environment.

89.     Upon information and belief, no remediation has occurred on any residential area in the Class Area.

### *School/Community Use Area Selected Remedy*

90.     The FFS/AA for the School/Community Use Areas analyzed two alternatives: (1) no action; and (2) excavate up to 15 feet and backfill with clean soil.

91.     Alternative 1 was recommended and became the Selected Remedy for OU3.

92.     Interim Remedial Measures ("IRM") had been implemented at the School Property, the Corning Christion Academy Property and the City of Corning Memorial Stadium.

93.     Upon information and belief, the Contamination is still present and visible in areas accessible to the public.

**D. Expedited Portions of Study Area.**

94.     In 2016, 66 Properties were identified as having no layer of fill material containing ash, brick, and/or glass, and 34 of those Properties had surface soil concentrations above New York State health-based standards.  This area of 66 homes is referred to as the "Expedited Portion" of the Study Area.

95.     The purpose of the designation of the Expedited Area was to provide NYSDEC with sufficient information to approve "No Further Action Letters" for Properties where applicable.

96.     A No Further Action Letter ("NFA") essentially states that a property is supposedly "clean" and no more remedial efforts are required.

97.     Upon information and belief, in May of 2017, 69 Properties received a No Further Action Letter.

98.     Upon information and belief, some of the Properties that were provided a No Further Action Letter still have levels of Contamination exceeding SCOs and/or other health-based standards.

**E.  2017 Consent Order.**

99.     On December 4, 2017, Corning entered into an Order on Consent and Administrative Settlement with NYSDEC, Index No. CO 8-20171204-140 for the Study Area, Site No. 851046 ("2017 Consent Order").

100.     The 2017 Consent Order supersedes and terminates the 2014 Consent Order, except that Corning is required to submit a detailed report of all testing completed on the Study Area.

101.     Under this Order, *inter alia*, Corning was to submit a Remedial Design/Remedial Action Work Plan ("RAWP") for OU1, OU2, and OU5 to NYSDEC within thirty (30) days after the effective date of the 2017 Consent Order.

102.     Upon information and belief, a RAWP has not been submitted.

**F.  Health Concerns Regarding the Contamination.**

103.     NYSDEC, during a public meeting, explained that the "routes of exposure" were direct contact with the Contamination, ingestion of the Contamination, and inhalation of the Contamination.

104.      Plaintiffs were advised that direct contact with the Contamination may occur if there is contact with surface soils, particularly in areas not covered with grass or pavement, especially in areas with visible ash, brick, and glass, if people dig in the ground, or while working/playing in the yard, or gardening.

105.     Ingestion of Contamination may occur if Plaintiffs or other members of the Class get soil on their hands and swallow the Contamination, or if the Contamination is in the soil particles on produce.

106.      Residents and occupants of the Class Area were advised to reduce exposure to the Contamination by: maintaining grass or mulch cover over the soil; avoid unnecessary digging,

avoiding bringing soil inside the house by brushing off clothes and removing shoes, using doormats, periodically damp mopping floors for soil that might be tracked indoors, and washing hands with soap and water after outdoor activities.

107. Further, residents were advised to grow vegetables in raised beds with clean soil (at least ten inches deep), and to wear gloves when working in the garden.

**G. The Harm Resulting from the Contamination.**

108. As a result of the Contamination, the value of the Plaintiffs' Properties and other Properties in the Class Area has been substantially decreased and impaired.

109. The Contamination, even if ultimately remediated, places a stigma upon the Properties, which negatively affects the fair market value of the Properties.

110. The releases have threatened the health of Plaintiffs and others in the Class Area, and exposed them to possible injury and the fear of future injury.

111. Additionally, the releases have disrupted their lives on a daily basis, causing considerable stress, inconvenience and discomfort.

112. Further, the presence of the Contamination in their living environment has caused Plaintiffs and other members of the Class to suffer the loss of the reasonable use and enjoyment of their Property, and aggravation and annoyance.

113. Plaintiffs and others in the Class Area have expended time and money to respond to the releases, including, but not limited to, investigating the nature of release, purchasing clean soil for gardens, etc.

114. Corning has failed to adequately investigate the Contamination.

115. Corning has taken insufficient steps to remediate the Contamination known to exist in the Class Area.

## CLASS ALLEGATIONS

**A. Definition of the Class.**

116.    Plaintiffs bring each of the claims in this action in their own names and on behalf

of a class of all persons similarly situated, pursuant to Rule 23 of the Federal Rules of Civil

Procedure.

117.    Plaintiffs seek to represent a Class of persons preliminarily defined as:

**All owners and residents of Properties within the following geographic area:**

(Image for Illustrative Purposes Only).



Bounded southerly by the Chemung River, westerly by Brisco Bridge, Route 414, and

Centerway, and northerly and easterly by Interstate Highway 86.

118.    Plaintiffs reserve the right to modify the class definition and/or propose one or more

subclasses if discovery reveals such modifications are appropriate.

**B.  Numerosity.**

119.  The Class Area consists of more than three hundred Properties.

120.  The Class consists of several hundred persons and/or legal entities, and is accordingly so numerous that joinder of all members is impractical.

**C.  Commonality**

121.  There are common questions of law and fact that affect the rights of each member of the Class, and the types of relief sought are common to the entire Class.

122.  The same conduct by Defendants have injured each member of the Class.

123.  The Class members are all impacted by Contamination caused by Corning, which is the predominant question in this matter.

124.  A class action is superior to other available methods for the fair and efficient adjudication of the controversy.

**D.  Typicality**

125.  Plaintiffs have the same interests in this matter as all the other members of the Class, and their claims are typical of all members of the Class.

126.  If brought and prosecuted individually, the claims of each Class member would require proof of many of the same material and substantive facts, rely upon the same legal theories and seek the same type of relief.

127.  The claims of Plaintiffs and the other Class members have a common origin and share a common basis. The claims originate from Corning's actions of depositing, releasing, and/or disposing of Contamination within the Houghton Plot.

128.  All Class members have suffered injury in fact proximately resulting in the loss of Property value by the depositing, releasing, and/or disposing of Contamination by Corning.

### E.  Adequacy of Representation

129.    Plaintiffs' claims are sufficiently aligned with the interests of the absent members of the Class to ensure that the Class claims will be prosecuted with diligence and care by Plaintiffs as representatives of the Class.

130.    Plaintiffs will fairly and adequately represent the interests of the Class and do not have interests adverse to the Class.

131.    Plaintiffs have retained the services of counsel, who are experienced in complex environmental litigation.

132.    Plaintiffs' counsel will adequately prosecute this action and will otherwise protect and fairly and adequately represent Plaintiffs and all absent Class members.

### F.  Class Treatment is the Superior Method of Adjudication

133.    A class action is superior to other methods for the fair and efficient adjudication of the controversies raised in this Complaint because:

a.  Individual claims by the Class members would be impracticable as the costs of pursuit would far exceed what any one Class member has at stake;

b.  Little or no individual litigation has been commenced over the controversies alleged in this Complaint and individual Class members are unlikely to have an interest in separately prosecuting and controlling individual actions;

c.  The concentration of litigation of these claims in one forum will achieve efficiency and promote judicial economy; and

d.  The proposed class action is manageable.

## CAUSE OF ACTION I

### *CERCLA COST RECOVERY*

134.   Plaintiffs, individually and on behalf of the Class, repeat, reallege and incorporate by reference paragraphs 1 through 133 of this Class Action Complaint, as if set forth in this paragraph at length.

135.   Corning Inc. and Corning Homes are "persons," as defined by Section 101(21) of CERCLA, 42 U.S.C. §9601(21).

136.   The Houghton Plot is a "facility" as defined by § 101(9) of CERCLA, 42 U.S.C. § 9601(9).

137.   The Hazardous Substances, including arsenic, cadmium, and lead, and the Hazardous Waste, are designated "hazardous substances" under CERCLA § 102(a), 42 U.S.C. § 9602, and thus are "hazardous substances" under CERCLA 101(14), 42 U.S.C. § 9601.

138.   Corning owned and operated the Facility during a time period when the Hazardous Substances, including arsenic, cadmium, and lead, were disposed of into the environment at the Facility.

139.   Corning is thus a "covered person" that is liable under CERCLA § 107(a)(2), 42 U.S.C. § 9607(a)(2).

140.   The Hazardous Substances that were deposited, released, and/or disposed by Corning, within the meaning of CERCLA §§ 101(22) and 107(a), 42 U.S.C. §§ 9601(22) and 9607(a), have resulted in the Contamination of Plaintiffs' Properties and of Properties throughout the Class Area.

141.   Corning is liable under CERCLA § 107(a), 42 U.S.C. § 9607(a), because it generated and disposed of the Hazardous Substances, and it owned and/or operated the Facility when Hazardous Substances were stored, used, disposed, or otherwise discharged on the Facility.

142.    As a result of the releases or threatened releases of the Hazardous Substances, Plaintiffs and the Class have incurred and continue to incur "response" costs within the meaning of CERCLA §§ 101(23)-(25), 42 U.S.C. §§ 9601(23)-(25), including, but not limited to, the retention of an environmental consultant to perform preliminary investigations of the contamination of Plaintiffs' and the Class' Property, and measures to reduce exposure to the Hazardous Substances.

143.    All such costs are necessary costs of response, and, to the extent required, consistent with the National Contingency Plan.

144.    Plaintiffs and the Class will continue to incur such response costs in the future.

145.    Plaintiffs and the Class are entitled to full reimbursement from Corning for all such costs, pursuant to CERCLA § 107(a), 42 U.S.C. § 9607(a).

146.    Plaintiffs did not pollute the Facility, contaminate their own Properties, or otherwise cause any releases of Hazardous Substances.

147.    Accordingly, Corning is strictly liable under Section 107(a) of CERCLA, 42 U.S.C. § 9607(a) for all response costs incurred by Plaintiffs and the Class.

## CAUSE OF ACTION II

### *NEGLIGENCE*

148.    Plaintiffs, individually and on behalf of the Class, repeat, reallege and incorporate by reference paragraphs 1 through 147 of this Class Action Complaint, as if set forth in this paragraph at length.

149.    Corning (including their officers, agents, servants, and/or employees) owed and still owe a duty to Plaintiffs and the other members of the Class not to permit or allow Hazardous Substances, including arsenic, cadmium, and lead, to contaminate Plaintiffs' Properties and other

Class Area Properties.

150.    Corning including their officers, agents, servants, and/or employees) also owed and still owe a duty to Plaintiffs and the other members of the Class to promptly and responsibly respond to known releases of contaminants in a manner which would prevent exposure to the Contamination, and otherwise protect Plaintiffs and the Class from this Contamination and the impacts they have on Class Area Properties.

151.    Corning (including their officers, agents, servants, and/or employees) acted unreasonably and negligently and breached these duties by its negligent and reckless acts and omissions in owning, operating, maintaining, and controlling the Facility, by the improper release and disposal of the Hazardous Substances, by the failure to properly handle, dispose of, contain and abate the Hazardous Substances at, and released from, the Facility, and by its failure to promptly and effectively investigate and address the Contamination.

152.    Corning (including their officers, agents, servants, and/or employees) also breached its duty to timely warn Plaintiffs and the Class of the risk of the Contamination on their Properties, and the risk of personal harm due to the presence of the Contamination on their Properties, including but not limited to the presence of arsenic, cadmium, and lead in ash, brick, and/or glass waste.

153.    These breaches of its duties to Plaintiffs and the Class are continuing and have proximately caused substantial injury and damage to Plaintiffs and the Class, including, but not limited to, injury in the form of damages to their Property, loss of Property value, loss of the reasonable use and enjoyment of their Property and quality of life, and aggravation and annoyance, all due to the actual presence of Contamination on their Properties.

154.    By reason of their negligence and recklessness, Corning is liable for all of the

damages to Plaintiffs and the Class, including damages to the Properties, proximately caused by the Contamination, and is responsible for investigation, cleanup, and removal of the Contamination.

155.    Corning's recklessness entitles Plaintiffs and the Class to an award of punitive damages, because such conduct was in willful disregard for their rights and safety, and constitutes outrageous conduct.

## CAUSE OF ACTION III

### *STRICT LIABILITY*

156.    Plaintiffs, individually and on behalf of the Class, repeat, reallege and incorporate by reference paragraphs 1 through 155 of this Class Action Complaint, as if set forth in this paragraph at length.

157.    Use, storage and disposal of Hazardous Substances, including arsenic, cadmium and lead and Hazardous Waste, including open dumping of Hazardous Substances, and leaving them in an unremediated, unmonitored, unreported and unsecured condition, is an abnormally hazardous activity.

158.    Corning (including their officers, agents, servants, and/or employees) engaged in abnormally dangerous activities by the manner in which they used, stored, and disposed of Hazardous Substances at the Facility, which: (a) created a high degree of risk of harm to others, and particularly to the Plaintiffs, whose Property has been adversely affected by the Contamination; (b) created a risk involving a likelihood that the harm threatened by the Corning's activities would be great; (c) created a risk of harm that could not be eliminated by reasonable care; (d) were not a matter of common usage; and (e) were inappropriate to the place that they were being carried on, in that they constituted a non-natural use of the Class Area which imposed

an unusual and extraordinary risk of harm to Plaintiffs' Properties, other Properties in the Class Area, and Plaintiffs and other persons in the Class Area.

159.    The risks posed by the Corning's conduct at the Facility are such as give rise to an absolute duty on the part of Corning to the Plaintiffs and others members of the Class.

160.    As a direct and proximate result of all Corning's conduct in engaging in the abnormally dangerous activities alleged above, Hazardous Substances generated and stored at the Facility have and continue to exist under and around the Properties of Plaintiffs and other Properties in the Class Area.

161.    The harm sustained by Plaintiffs and the other members of the Class is exactly the kind of harm posed, the possibility of which made Corning's activities abnormally dangerous.

**162.**    By reason of these abnormally dangerous activities, Corning is strictly liable for all of the damages to Plaintiffs and the Class, including damages to the Properties, proximately caused by the Contamination, and is responsible for investigation, cleanup, and removal of the Contamination, as well as punitive damages.

## CAUSE OF ACTION IV

### *PRIVATE NUISANCE*

163.    Plaintiffs, individually and on behalf of the Class, repeat, reallege and incorporate by reference paragraphs 1 through 162 of this Class Action Complaint, as if set forth in this paragraph at length.

164.    A condition or activity that unreasonably interferes with the use of Property is a nuisance.

165.    The Contamination has obstructed the free use of Plaintiffs' Properties and other Properties in the Class Area so as to substantially and unreasonably interfere with the comfortable

enjoyment of life and/or Property, including in but not limited to causing Plaintiffs and other residents of the Class Area to:

    a.   remain inside their homes and forego use of their yards;

    b.   refrain from allowing their dogs to use their yards;

    c.   refrain from allowing their children and grandchildren to use their yards;

    d.   refrain from the use and enjoyment of their vegetables gardens and to cease consuming the vegetables grown in their yards;

    e.   refrain from the use and enjoyment of their flower gardens;

    f.   suffer embarrassment and reluctance to invite guests to their homes.

166.    Corning owed and continues to owe a duty to Plaintiffs and the Class to take positive action to prevent and/or abate the interference with the invasion of their private interests.

167.    By failing to properly dispose of, contain and abate the Hazardous Substances at, and released from, the Facility, Corning (including their officers, agents, servants, and/or employees) has acted negligently, recklessly and/or intentionally, and/or has engaged in abnormally dangerous activities, resulting in an unreasonable risk of foreseeable harm by causing the invasion of Plaintiffs' Properties and other Properties in the Class Area by the Contamination.

168.    As a foreseeable, direct, and proximate result of this conduct of Corning, Plaintiffs and the Class have suffered injuries and damages to their Properties.

169.    The injuries and damages suffered by Plaintiffs and the Class are especially injurious to themselves because they uniquely suffer harm relating to the use and enjoyment of their land and Property, and decreased Property values, which are not harms suffered by the general public.

170.    By causing the Contamination to physically invade the Properties, Corning

intentionally, recklessly, and negligently created a nuisance which substantially and unreasonably interfered with use and enjoyment of the Properties by the owners and residents of those Properties.

171.    Accordingly, Defendants are liable to Plaintiffs, and all members of the Class, for all their damages proximately caused by this private nuisance, including damages to the Properties, proximately caused by the Contamination, and is responsible for investigation, cleanup, and removal of the Contamination, as well as punitive damages.

<u>**CAUSE OF ACTION V**</u>

***PUBLIC NUISANCE***

172.    Plaintiffs, individually and on behalf of the Class, repeat, reallege and incorporate by reference paragraphs 1 through 171 of this Class Action Complaint, as if set forth in this paragraph at length.

173.    Corning (including their officers, agents, servants, and/or employees), by causing the Contamination, have interfered with the rights common to all, including groundwater and public lands.

174.    Plaintiffs and the other members of the Class have sustained special damages from this public nuisance.

175.    Accordingly, Corning is liable to Plaintiffs and the other members of the Class for all of their damages proximately caused by such public nuisance, including damages to the Properties, proximately caused by the Contamination, and is responsible for investigation, cleanup, and removal of the Contamination, as well as punitive damages.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs, individually and on behalf of the proposed Class, pray for judgment as follows:

A. A trial by jury on all counts so triable;

B. Certification of the proposed Class pursuant to Federal Rule of Civil Procedure 23;

C. Designation of Plaintiffs as representative of the proposed Class and designation of their counsel as Class counsel;

D. Judgment against Defendants for all response costs incurred by Plaintiffs and others in the Class Area under CERCLA, including, but not limited to, costs of investigation, and declaring that Corning is liable for all response costs to be incurred by Plaintiffs and others in the Class area under CERCLA.

E. Judgment in favor of Plaintiffs and the Class members and against Corning on Causes of Action II, III, IV and V, awarding Plaintiffs and the Class compensatory and other appropriate damages in amounts to be determined by the evidence at trial and allowed by law;

F. Award Plaintiffs and the Class members compensatory and punitive damages, and attorneys' fees and costs, including pre-judgment and post-judgment interest ;

G. Orders injunctive relief which: (1) permanently restrains and enjoins Corning from allowing the Contamination from continuing to persist, or migrate onto or through Plaintiffs' and other Class Area Properties, and (2) compels Corning to comprehensively remediate the Contamination it has caused at the Houghton Plot, on Plaintiffs' Properties, and on other Class Area Properties.

H. Such further relief as the Court deems just and proper.

Dated: Rochester, New York
      February 9, 2018

                                  __/S/ Alan J. Knauf_____

**KNAUF SHAW LLP**
*Attorneys for Plaintiffs*
Alan J. Knauf, Esq., Esq. and
 Melissa M. Valle, Esq., of Counsel
1400 Crossroads Building
2 State Street
Rochester, New York 14614
Tel.: (585) 546-8430