UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

JOHN READ, et al.,

                            Plaintiffs,

            v.

CORNING INCORPORATED, et al.,

                            Defendants.
_____

DECISION AND ORDER

18-CV-6131L

        This action was brought by four property owners in Corning, New York ("Corning, NY"),

against Corning Incorporated ("Corning"), asserting claims under the Comprehensive

Environmental, Response, Compensation and Liability Act of 1980 ("CERCLA"), 42 U.S.C.

§ 9601 *et seq.*, and under New York state law.  Plaintiffs seek damages and "response costs" due

to alleged contamination by hazardous substances of property owned by plaintiffs.  The

complaint is ostensibly brought on behalf of a class of owners, occupants an residents of the area

in question (identified in the complaint as the "Houghton Plot"), but at this point no class has

been certified.

        Corning has moved to dismiss most of plaintiffs' claims, and to stay the remaining claims

pending a decision by the New York State Department of Environmental Conservation ("DEC")

on an appropriate remedy, pursuant to proceedings that have been taking place before the DEC.

# BACKGROUND

## I. Plaintiffs' Allegations

The following allegations are taken from plaintiffs' complaint.  For the purposes of this factual background, plaintiffs' allegations are taken as true.[1]

Plaintiffs own properties in an area in Corning, NY, known as the "Houghton Plot."  The area comprising the Houghton Plot was at one time farmland, and was later acquired by Corning Homes, Inc., which is a predecessor in interest to Corning.  Corning Homes acquired the land in 1920 from the heirs of the late founder of Corning Flint Glass Works.

The Houghton Plot encompasses areas in which Corning released or disposed of fill containing hazardous substances, including arsenic, cadmium and lead.  It appears that this occurred prior to plaintiffs' acquisition of their particular plots; *see, e.g.*, Complaint ¶ 47 (stating that Corning deposited the fill "[m]any years ago"), ¶ 52 (stating that the alleged contaminated fill "may have ... been used to improve drainage and to fill in low-lying areas in order to develop the neighborhood"), ¶ 82 (stating that the area "was developed into to [sic] a residential area after the Contamination was deposited").  Plaintiffs do not allege that any contaminants have been deposited in the Houghton Plot since they purchased their properties.

According to the complaint, on June 27, 2014, Corning entered into an Order on Consent with the DEC ("2014 Order"), following the discovery of contamination at a location in Corning.

---

[1] Defendants' motion is based on various grounds.  To the extent that defendants seek dismissal of plaintiffs' claims under Rule 12(b)(6) of the Federal Rules of Civil Procedure, the Court limits its review of the record to matters contained in or integral to the pleadings.  But the Court is allowed to consider matters outside the pleadings as to the balance of defendants' motion.  *See Lewis v. Hall*, No. 17-CV-280, 2018 WL 5724443, at *2 (M.D.Ga. Nov. 1, 2018) ("since dismissal for failure to exhaust is not an adjudication on the merits, the Court can resolve factual disputes using evidence from outside the pleadings"); *Sierra Club v. Chesapeake Operating, LLC*, 248 F.Supp.3d 1194, 1199 (W.D.Okla. 2017) (court may consider materials outside the pleadings in deciding motion to dismiss based on primary-jurisdiction grounds).

*See* Complaint ¶ 53. The Order on Consent itself does not appear to be in the record, but the parties do not dispute that it was issued. The gist of it was that Corning would undertake a study to determine the extent of the contamination, and recommend an appropriate plan to remediate the contamination. Corning commissioned a private firm, Weston Solutions ("Weston") to undertake the study and prepare the report.

During the course of that study, Weston submitted a "Focused Feasibility Study/Alternatives Analysis" ("FFS") dated March 23, 2017. (Dkt. #11-7.) That report offered several alternative remedial measures, including no action at all (which was used as a baseline option, for purposes of comparison with the other options); excavation and replacement of soil to a depth of two feet; and excavation to a depth of 15 feet, with subsequent backfill.

In its conclusion, Weston recommended the two-foot excavation, with a soil cover. The reasons are fully stated in the FFS (Dkt. #11-7 at 91), but Weston's report stated that based on its study, it concluded that "[d]eeper excavations are possible, but impracticable, and do not provide any significant additional benefit with respect to overall health or environmental protectiveness." *Id.* In fact, the report stated that excavations deeper than two feet would likely do more harm than good, for a number of reasons, including the demolition of existing structures. *Id.*

After a period in which members of the public were invited to submit comments, the DEC in July 2017 issued a Final Decision Document ("FDD"), setting forth a remedy for the subject area. (Dkt. #11-9 at 3.)[2] The DEC stated that "[t]he remedy will consist of excavation

---

[2] The comments that were submitted to the DEC included one by plaintiffs' counsel (Knauf Shaw LLC), which raised a number of concerns, including the depth of the proposed removal of soil. The DEC responded to that comment, and explained why it had concluded that the appropriate remedy would be the two-foot excavation proposed by Weston. Dkt. #11-8 at 14-15.

and removal of target fill to conform to [DEC standards] and excavation and removal of soil within the top two feet ... ."  *Id.*

On December 4, 2017, Corning Inc. and the DEC entered into another Order on Consent and Administrative Settlement ("2017 Order"), which superseded the 2014 Order.  (Dkt. #11-10.) The 2017 Order stated that "[c]ommencing upon the effective date of this Order [which was specified as the tenth day after the order was signed by the DEC commissioner], Respondent [*i.e.*, Corning Inc.] will implement the remedial activities required by [the] Final Decision Document ... ."  *Id.* at 6.  The DEC also stated that it accepted Weston's FFS.  (Dkt. #11-10 at 6.)

The 2017 Order also provided that Corning would submit a Remedial Action Work Plan ("RAWP") to the DEC, describing "the means and methods for determining the extent of remediation and for implementing the remediation" within the subject area, as called for in the FFS.  (Dkt. #11-10 at 6.)  Corning did so, in a report prepared by Weston, dated April 6, 2018. (Dkt. #11-6.)  In short, the RAWP sets forth the details of implementing the DEC-approved remedy of excavation and removal of the top two feet of soil in the subject area.

Plaintiffs filed the complaint in this action on February 9, 2018.  They have asserted five causes of action, on behalf of themselves and other owners, occupants and residents of properties in the Houghton Plot:  (1) a claim for response costs under CERCLA, based on Corning's disposal of hazardous substances on the subject property; (2) a state-law claim for negligence, based on the disposal of hazardous substances, and defendants' failure to warn plaintiffs of the danger ensuing from that disposal; (3) strict liability, based on a theory of abnormally dangerous activity; (4) private nuisance; and (5) public nuisance.  Plaintiffs seek response costs,

compensatory and punitive damages, and injunctive relief requiring Corning to undertake additional remediation efforts, beyond what was approved by the DEC.

Defendants now ask the Court to: (1) dismiss all plaintiffs' claims for injunctive relief because of plaintiffs' alleged failure to exhaust their administrative remedies, and based on the DEC's primary jurisdiction over the remediation of the subject property; (2) dismiss all of plaintiffs' common-law causes of action, for failure to state a claim upon which relief can be granted; and (3) stay any remaining damages claims, under the primary-jurisdiction doctrine.

## DISCUSSION

### I. Failure to Exhaust Administrative Remedies/Primary Jurisdiction

Defendants contend that the Court should dismiss plaintiffs' requests for injunctive relief based on plaintiffs' failure to exhaust their administrative remedies. They also contend that the Court should dismiss plaintiffs' claims for injunctive relief, and stay their claims for damages, under the doctrine of primary jurisdiction. As they relate to this case, these two issues are intertwined.

### A. Exhaustion: General Principles

"It is hornbook law that one who objects to the act of an administrative agency must exhaust available administrative remedies before being permitted to litigate in a court of law." *Watergate II Apts. v. Buffalo Sewer Auth.*, 46 N.Y.2d 52, 57 (1978) (citation omitted). *See Town of Oyster Bay v. Kirkland*, 19 N.Y.3d 1035, 1038 (2012), *cert. denied*, 568 U.S. 1213 (2013).

In general, in New York, a party challenging an administrative action must first challenge it via an Article 78 proceeding. *See Matneja v. Zito*, 163 A.D.3d 802, 803 (2d Dep't 2018) ("since the plaintiff did not challenge the DHCR's order by filing a petition for administrative review and then initiating a CPLR article 78 proceeding, he did not exhaust his administrative remedies and, thus, there is no lawful basis for the Supreme Court to amend the order") (citing *Watergate II*, 46 N.Y.2d at 57); *see also Lewis Tree Service, Inc. v. Fire Dep't of City of New York*, 66 N.Y.2d 667, 669 (1985) ("The Comptroller's determination, made in accordance with the authority vested in him by [state law] was never challenged in an article 78 proceeding, and, under settled principles, cannot be collaterally attacked in this proceeding").

This doctrine should not be applied mechanically, but it "should be applied where it 'furthers the ... goals of relieving the courts of the burden of deciding questions entrusted to an agency, preventing premature judicial interference [with the work of the agency,] and affording the agency the opportunity, in advance of possible judicial review, to prepare a record reflective of its 'expertise and judgment.'" *Friedman v. Rice*, 30 N.Y.3d 461, 474 (2017) (quoting *Watergate II*, 46 N.Y.2d at 57).

## B. Primary Jurisdiction:  General Principles

"The 'primary jurisdiction' doctrine governs the question of whether a particular issue or claim is 'initially cognizable' in a court action or must be presented to an administrative agency for determination in the first instance." *State of Connecticut v. United States E.P.A.*, 656 F.2d 902, 905 (2d Cir. 1981) (citing *United States v. Western Pacific R.R. Co.*, 352 U.S. 59, 63-64 (1956)).  "Generally, primary jurisdiction applies whenever enforcement of the claim requires

resolution of issues which, under a regulatory scheme, have been placed within the special

competence of an administrative body; in such a case the judicial process is suspended pending

referral of such issues to the administrative body for its views." *County of Suffolk v. Long Island*

*Lighting Co.*, 907 F.2d 1295, 1309 (2d Cir. 1990) (citations omitted).  Primary jurisdiction

allows an agency to decide factual issues that require specialized, technical knowledge that are

particularly within its area of expertise and that have been legislatively committed to its

judgment. *Johnson v. Nyack Hosp.*, 964 F.2d 116, 122 (2d Cir. 1992).

"The primary jurisdiction doctrine is analogous to the requirement of exhaustion of

administrative remedies–under both doctrines, courts will defer the exercise of their jurisdiction

until the administrative process has run its course." *In re Methyl Tertiary Butyl Ether (MTBE)*

*Products Liability Litigation*, 476 F.Supp.2d 275, 284 (S.D.N.Y. 2007) (citing *Western Pacific*,

352 U.S. at 64).  The doctrine should not be applied lightly and is the exception, not the norm.

*N.Y.S. Thruway Auth. v. Level 3 Commc'n, LLC*, 734 F.Supp.2d 257, 263 (N.D.N.Y. 2010).

Nevertheless, the exhaustion and primary-jurisdiction doctrines are separate and distinct.

In *Western Pacific*, the Supreme Court explained the relationship between primary jurisdiction

and exhaustion of administrative remedies:

> The doctrine of primary jurisdiction, like the rule requiring exhaustion of administrative
> remedies, is concerned with promoting proper relationships between the courts and
> administrative agencies charged with particular regulatory duties. "Exhaustion" applies
> where a claim is cognizable in the first instance by an administrative agency alone;
> judicial interference is withheld until the administrative process has run its course.
> "Primary jurisdiction," on the other hand, applies where a claim is originally cognizable
> in the courts, and comes into play whenever enforcement of the claim requires the
> resolution of issues which, under a regulatory scheme, have been placed within the
> special competence of an administrative body; in such a case the judicial process is
> suspended pending referral of such issues to the administrative body for its views.

*Western Pacific*, 352 U.S. at 63-64.

When determining whether the doctrine of primary jurisdiction applies, courts in the

Second Circuit typically consider four factors:

> (1) whether the question at issue is within the conventional experience of judges or whether it involves technical or policy considerations within the agency's particular field of expertise; (2) whether the question at issue is particularly within the agency's discretion; (3) whether there exists a substantial danger of inconsistent rulings; and (4) whether a prior application to the agency has been made.

*Ellis v. Tribune Television Co.*, 443 F.3d 71, 82-83 (2d Cir. 2006).


**C. Application to this Case**

Defendants assert that if plaintiffs were dissatisfied with the remediation plan chosen by

the DEC, their exclusive remedy was to file an Article 78 petition in state court, and that because

plaintiffs failed to do so, their claims for injunctive relief are barred for failure to exhaust their

administrative remedies. In the alternative, defendants argue that the Court should stay its hand

under the primary-jurisdiction doctrine.

Plaintiffs contend that they have exhausted their administrative remedies. That argument

is addressed below. But plaintiffs also argue that there is no need for them to exhaust their

administrative remedies in the first place, because they are not directly challenging the DEC's

remedy.

The complaint does not make clear what the legal bases are for the particular relief

sought. It asserts several causes of action, followed by claims for relief, without differentiating

the grounds for those various forms of relief.

As to plaintiffs' request for injunctive relief, the complaint is also less than specific. Plaintiffs simply request an order which "permanently restrains and enjoins Corning from allowing the Contamination from continuing to persist, or migrate onto or through" their properties, and which "compels Corning to comprehensively remediate the Contamination it has caused ... ." (Dkt. #1 at 25.)

Plaintiffs' papers, and their attorney's statements at oral argument, have shed some light on these matters. In their response to defendants' motion, plaintiffs state, with respect to the exhaustion issue, that they "are not directly attacking the decisionmaking by NYSDEC, so there was no need to exhaust administrative remedies," and that they have "brought this action under CERCLA, and under that regulatory scheme, the remedy cannot be challenged until after it has been completed." Plaintiffs' Mem. at 9 (Dkt. #19 at 18). Plaintiffs state that under CERCLA, "any court challenge to the remedy [ordered by the DEC] is premature." *Id.* at 10.

But plaintiffs *have* expressly requested equitable relief, which, if ordered, would effectively alter, or go beyond, the remedy directed by the DEC. At oral argument, plaintiffs' attorney was imprecise about the exact nature of the injunctive relief that plaintiffs seek, stating, "[W]e certainly think that more can be done on the remedy, whether it's digging another 13 feet or something else ... ." (Dkt. #25 at 25). The reference to "another 13 feet" was obviously an allusion to the DEC's adoption of a two-foot, rather than a 15-foot excavation remedy. But clearly, plaintiffs want more than what was ordered or approved by the DEC.

Plaintiffs' attorney also freely admitted at oral argument that plaintiffs made what amounted to a tactical decision not to bring an Article 78 proceeding in state court, challenging the DEC's approved remedy. He stated, "We don't think we even could because ... it's really an

interim decision." (Dkt. #25 at 4.) He added that plaintiffs are "suing under CERCLA," and, tellingly, that "it's probably unlikely that we would succeed in a claim that [the DEC's decision] was arbitrary and capricious ... ." *Id.* at 5. In other words, plaintiffs and their counsel concluded that it would be unlikely for them to succeed on a direct challenge to the DEC's decision, under state law. So rather than pursue a head-on approach, seeking to overturn or modify the DEC's decision, plaintiffs chose to bypass that route altogether, and to seek relief in federal court under CERCLA. But that end-run attempt runs afoul of the primary-jurisdiction doctrine.

Under the New York Environmental Conservation Law, the DEC has jurisdiction over remedial programs for inactive hazardous waste disposal sites. *See* N.Y. E.C.L. § 27-1313. Pursuant to that authority, the DEC in the case at bar has engaged in an extensive process to investigate the contamination at issue here, and come up with what it has found to be an appropriate remediation plan.

This Court likewise has jurisdiction over plaintiffs' claims, under CERCLA. But the Court's subject matter jurisdiction is not at issue. "Primary jurisdiction is not a doctrine that implicates the subject matter of the federal courts. Rather, it is a prudential doctrine under which [a] court may, under appropriate circumstances, determine that the initial decision-making responsibility should be performed by the relevant agency rather than the courts." *Collins v. Olin Corp.*, 418 F.Supp.2d 34, 42 (D.Conn. 2006) (quoting *Syntek Semiconductor Co. v. Microchip Tech., Inc.*, 307 F.3d 775, 780 (9th Cir. 2002)).

Although "most primary jurisdiction cases involve questions of whether the district court should defer to a *federal* agency's determination of factual questions," *Johnson v. Nyack Corp.*, 964 F2d 116, 122 (2d Cir. 1992), the doctrine extends to state agencies as well. The Second

Circuit in *Johnson* stated, in the context of a physician's challenge to a hospital's revocation of his surgery privileges, that its "holding that the district court must wait for a *state* agency to resolve the complicated factual questions underlying Johnson's federal antitrust claim is not inconsistent with the rationale behind the primary jurisdiction doctrine." *Id.*

In support of that conclusion, the court stated:

Primary jurisdiction allows an agency to pass on factual issues that require specialized, technical knowledge. Either a federal or state agency may have the requisite competence to serve this purpose. Because the [state] PHC has the distinctive expertise to divine whether defendants had a legitimate medical reason for revoking Johnson's privileges, the PHC should make this determination before the district court considers the issue.

*Id.* at 122-23.

At least one district court from within this circuit has applied the primary-jurisdiction doctrine in the context of an environmental claim involving a state agency. In *Collins v. Olin Corp.*, 418 F.Supp.2d 34 (D.Conn. 2006), several homeowners brought a putative class action against a town and private corporation, seeking damages and injunctive relief for the diminution in the value of their properties due to alleged contamination of their soil and groundwater. The Connecticut Department of Environmental Protection ("DEP") entered into a consent order with the town and corporation (and two other entities), in which the parties agreed to investigate and remediate the contamination.

After reviewing the relevant statutory and regulatory frameworks, and the details of the consent order, the court found that "issues of injunctive relief in the instant action are more properly within the DEP's field of expertise and discretion." *Id.* at 44. Specifically, the court said that "[d]eciding what remedy is appropriate for varying levels of contamination, and

overseeing that remedial effort, is a matter more properly within the technical expertise and experience of the DEP." *Id.* at 45.

Similarly, other federal courts have applied the primary-jurisdiction doctrine to defer to state agencies with particular expertise in the matters at issue. *See*, *e.g.*, *McCormick v. Halliburton Co.*, No. CIV-11-1272, 2012 WL 1119493, at *2-*3 (W.D.Okla. Apr. 3, 2012) (finding that court "should abstain from exercising jurisdiction under the [federal Resource Conservation and Recovery Act] in order to permit the [Oklahoma Department of Environmental Quality] to continue its investigation, supervision, and remediation of the Site without the prospect of conflicting directive from this Court as to how the contamination should be remedied"); *Friends of Santa Fe County v. LAC Minerals, Inc.*, 892 F.Supp. 1333, 1349-50 (D.N.M. 1995) (declining to exercise jurisdiction over environmental claim, where state agency, which was "far better suited to resolve [the relevant] issues by reason of 'specialization, by insight gained through experience, and by more flexible procedure,'" had undertaken investigation and had entered into stipulated remedial order) (quoting *Far East Conference v. United States*, 342 U.S. 570, 575 (1952)). *See also Illinois Bell Telephone Co., Inc. v. Global NAPs Illinois, Inc.*, 551 F.3d 587, 594 (7th Cir. 2008) ("Primary jurisdiction usually involves referral to a federal agency, but in a case such as this, in which a state commission is exercising in effect delegated federal power, the logic of the doctrine permits a federal court's reference to a state agency").

Having considered the relevant legal factors and the facts presented, the Court concludes that under the primary-jurisdiction doctrine, it would be better for the Court to stay its hand here, in favor of the DEC proceedings. In fact, the decision is not even a close one.

An analysis of the abovementioned four factors supports this conclusion. First, the questions presented here plainly involve matters that are not within the conventional experience of judges, and which involve technical or policy considerations within the agency's particular field of expertise. While the Court has jurisdiction over plaintiff's claims, the DEC has considerably more expertise in the underlying factual matters. The DEC deals with problems arising from environmental contamination on a regular basis, and presumably is well equipped to deal with such matters. For similar reasons, the underlying question at issue–how best to remediate the contamination–has been committed to the DEC's discretion by the New York legislature. New York E.C.L. § 27-1313 provides that the DEC "shall be responsible ... for inactive hazardous waste disposal site remedial programs," with certain exceptions that are not at issue here.

Third, if this Court were to grant the relief sought by plaintiffs, there would obviously be a significant risk of inconsistent rulings. The DEC has approved a two-foot excavation remedy; plaintiffs contend that the two-foot remedy is not good enough. They want the Court to order a literally more extensive remedy. At oral argument, plaintiffs' attorney expressly stated that in plaintiffs' view, the remedy "should be more" than what was approved by the DEC. (Dkt. #25 at 25.) Indeed, were it otherwise, the Court and the parties would not be dealing with this dispute in the first place.

If this case were to go forward, and the Court were ultimately to order, for example, a fifteen-foot excavation remedy, one can only imagine the delay and uncertainty that would ensue, as Corning found itself whipsawed between two different remedies ordered by two different entities, each with jurisdiction over the matter. Having two proceedings moving forward, on

separate tracks, with the possibility of inconsistent rulings, would inject needless confusion into the process, as well as likely inefficiency and delay into the actual remediation, which is supposed to be the ultimate goal here. *See Friends of Santa Fe County*, 892 F.Supp. at 1350 (noting that "[s]hould this Court independently determine an appropriate investigatory and remediation plan, aspects of the order may contradict [the state agency's remedial order] and subject Defendants to conflicting obligations").

The fourth factor that courts consider–whether a prior application to the agency has been made–obviously weighs in further favor of this Court staying its hand. The application has not only been made, the process has advanced to the point where the DEC has actually approved a specific remedy. Late-in-the-day meddling by this Court would serve little if any useful purpose.

As stated above, the exhaustion doctrine is of little relevance to this case, in one sense at least. Exhaustion typically comes into play when a party seeks to challenge an administrative decision; in general, one cannot seek to overturn an administrative decision in court without having first availed oneself of all available administrative remedies. But as explained above, plaintiffs have disavowed any frontal challenge to the DEC's order; they have brought a claim for relief under CERCLA, that on its face is not based on the DEC's order.

But the fact that plaintiffs, by their own admission, initially participated in the DEC process, and then took a different tack, out of strategic considerations, only adds weight to the Court's ruling as to the primary-jurisdiction issue. It is evident that at some point after they entered into the DEC administrative process, plaintiffs concluded that they stood a better chance of success pursuing claims in federal court. Based on that calculation, they abandoned the remedies that New York State had made available to them, and filed suit in this Court.

14

The Court recognizes that exhaustion of state administrative remedies is not, strictly speaking, an absolute precondition for bringing a CERCLA claim in federal court. But the fact that plaintiffs deliberately chose a federal forum, in pursuit of a federal remedy, to avoid a state administrative process that was well advanced, but where, in plaintiffs' estimation, their prospects of success were growing increasingly dim, only serves to illustrate why this Court should stay its hand in favor of the state administrative agency that has been dealing with this matter for years.

Having said all that, the Court will address plaintiffs' alternative argument that they *have* in fact exhausted their state administrative remedies. Plaintiffs contend that they did so simply by raising objections during the process leading up to the DEC's adoption of the two-foot remedy.

In support of their argument, plaintiffs state that "[t]he New York State Court of Appeals has held that the exhaustion of administrative remedies doctrine applies only when '[n]o one raised the issue.'" (Dkt. #19 at 19.) The case they have cited in support of that assertion, *In re Jackson v. New York State Urban Dev. Corp.*, 67 N.Y.2d 400 (1986), does not stand for that proposition whatsoever. The court in *Jackson* was addressing a challenge to a plan by a state agency to redevelop the Times Square area of Manhattan. In the course of the administrative process, two Article 78 proceedings were brought, unsuccessfully, by petitioners challenging the project.

The petitioners then filed an action in state court, and lost. The New York Court of Appeals affirmed, and in doing so, it noted as to one particular issue concerning certain environmental effects of the plan, that "[n]o one raised the issue during the lengthy hearing and

15

comment periods before the FEIS [Final Environmental Impact Statement] was issued." *Id.* at 427. The court said that while the state agency had an affirmative obligation to consider environmental effects, "petitioners' silence cannot be overlooked in determining whether the agency's failure to discuss an issue in the FEIS was reasonable." *Id.*

At no point, then, did the court in *Jackson* hold that the exhaustion of administrative remedies doctrine applies *only* when "no one raised the issue." To assert otherwise grossly misrepresents the court's holding.[3]

In short, plaintiffs' argument would stand the exhaustion requirement on its head. They argue, in effect, that simply to raise an issue, somewhere along the line in the administrative process, obviates the need to pursue it further during that process. That argument is illogical, nonsensical, and not supported by the law.

In a grasp at one more straw, plaintiffs argue that they could not challenge the DEC remedy by means of an Article 78 proceeding, because "the remedy was not finalized - only the general elements of the remedy." (Dkt. #19 at 20.) But it is clear from the terms of the 2017 Order that it is not, as plaintiffs suggest, merely some preliminary document; it is an order, setting forth a very detailed course of remediation. That the order contemplated further investigative and remedial studies and plans during the course of the remediation does not render

---

[3] Plaintiffs have also cited *Town of Red Hook v Dutchess County Resource Recovery Agency*, 146 Misc.2d 723 (Sup. Ct. Dutchess County 1990), but that case actually *involved* an Article 78 proceeding. The court denied the agency's motion to dismiss for failure to exhaust because "all of the objections raised in the [Article 78] petition were voiced by petitioner or by others during the administrative process" preceding the filing of the Article 78 petition. *Id.* at 727.

Plaintiffs have also cited *Parks Council v. City of New York*, 174 A.D.2d 446 (1st Dep't 1991), for the proposition that the exhaustion requirement is satisfied "[a]s long as a member of an organization raised issues related to the issues in litigation." (Dkt. #19 at 20.) But the case cited is simply a one-line decision affirming a lower-court judgment, without an opinion. If plaintiffs were privy to some further information about that case, they should have shared it with the Court.

it "non-final" for Article 78 purposes.  *See In re Gordon v. Rush*, 100 N.Y.2d 236, 242 (2003) (administrative determination is final, and therefore ripe for review under Article 78, when it represents a definitive position on an issue which imposes an obligation, denies a right or fixes some legal relationship, resulting in an actual, concrete injury).

On the exhaustion issue, then, plaintiffs' arguments may be summarized as follows: (1) we (*i.e.*, plaintiffs) *can't* exhaust; (2) we don't *need* to exhaust; but (3) we *did* exhaust our remedies.  When all is said and done, though, plaintiffs' position was probably most candidly stated by plaintiffs' counsel at oral argument, when he said that had plaintiffs pursued an Article 78 proceeding, they would have had a "difficult" and "challenging" case ahead of them.  (Dkt. #25 at 26, 27.)  He may have been correct in that assessment, but that does not mean that this Court should now step in and interfere with an ongoing process being conducted by a state administrative agency that has been charged with authority to address the matters at issue, particularly where the plaintiffs deliberately chose not to pursue the avenues of relief that are or were available to them in the state courts.

**II. Common Law Claims**

**A. Negligence**

In their second cause of action, which is brought under New York law, plaintiffs allege that Corning was negligent in permitting the release of contaminants on the subject property, in failing to warn the plaintiffs about the dangers resulting therefrom, and in failing to remediate the contamination.

Under long-established principles of common law, a plaintiff asserting a negligence claim under New York law must allege "(1) a duty owed by the defendant to the plaintiff, (2) a breach thereof, and (3) injury proximately resulting therefrom." *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 286 (2d Cir. 2006) (internal quotation marks omitted). In general, the "duty" in question is a duty to exercise reasonable care; in other words, to avoid acting in a way that will give rise to a foreseeable, but avoidable, risk of harm to others. *See Korean Air Lines Co. v. McLean*, 118 F.Supp.3d 471, 486 (E.D.N.Y. 2015).

In the case at bar, the complaint alleges that "[m]any years ago, Corning deposited, released, and/or disposed of Fill containing ash, brick, and/or glass waste," which has since been found to contain hazardous chemicals. Complaint ¶ 47. There is no indication from the complaint that the disposal of those materials, at that time, was unlawful or unauthorized.

At some point in the past, the area where the fill was deposited was farmland, and it was later developed into the Houghton Plot. The complaint is short on specifics, in terms of the timeline, but it is apparent that the disposal of these materials occurred long before plaintiffs bought their properties.

There is no allegation that at the time Corning deposited the fill, those "many years ago," it knew or should have known that the fill contained hazardous chemicals. There are also no allegations that, at that time, Corning owed a duty to plaintiffs, which is not surprising, since plaintiffs did not purchase their properties until years later. All the complaint alleges is that at some point after the materials were deposited, the contamination was discovered.

Plaintiffs allege that Corning, having deposited these substances on the Houghton Plot, owes plaintiffs and other members of the putative class a duty to take steps to protect them from

18

exposure to the contamination. But the allegations in the complaint indicate that is exactly what Corning has been doing, pursuant to the DEC-authorized remediation process. Plaintiffs may be dissatisfied with the results of that process, but there are no allegations suggesting that Corning has failed to act to remediate the subject area.

Nor does the complaint set forth allegations supporting a failure-to-warn claim. Plaintiffs do not allege that Corning knew of the contamination, but failed to disclose it to plaintiffs or the appropriate authorities. But there are no facts alleged to support that assertion. All that the complaint alleges is that at some point in the past, after Corning deposited certain materials on the site in question, someone discovered that those substances contained hazardous chemicals, and that Corning then began working with the DEC to remediate the contamination. There are *no* facts alleged that would support an inference that Corning knew of the contamination but failed to disclose it, to plaintiffs or anyone else. Absent such allegations, the court cannot simply "fill in the blanks" to supply what is missing, on a motion to dismiss. *See Pungitore v. Barbera*, 506 Fed.Appx. 40, 42-43 (2d Cir. 2012) (stating that court "must refuse to credit" plaintiff's conclusory allegations, and finding that her "non-conclusory factual allegations did not move her complaint 'across the line from conceivable to plausible'") (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)); *Whitney v. New Mexico*, 113 F.3d 1170, 1173-74 (10th Cir. 1997) (stating that courts "will not supply additional factual allegations to round out a plaintiff's complaint").

**B. Strict Liability for Abnormally Dangerous Activity**

In their third cause of action, plaintiffs assert a claim sounding in strict liability, based on defendants' alleged engagement in an abnormally dangerous activity:  the disposal of hazardous substances at the site in question.

New York common law imposes strict liability on landowners for certain abnormally dangerous or ultra-hazardous activities taking place on their property.  *See Doundoulakis v. Town of Hempstead*, 42 N.Y.2d 440, 448 (1977).  But defendants' alleged acts here do not fall into that category.  Liability is premised upon the policy consideration that "those who engage in activity of sufficiently high risk of harm to others, especially if there are reasonable, even if more costly, alternatives, should bear the cost of harm caused to the innocent."  *Id.*

Multiple factors must be considered in assessing whether an activity is abnormally dangerous, including the following:  (1) the existence of a high degree of risk of harm to the person, land or chattels of others; (2) the likelihood that the harm that results from it will be great; (3) the inability to eliminate the risk by the exercise of reasonable care; (4) the extent to which the activity is not a matter of common usage; (5) the inappropriateness of the activity to the place where it is carried on; and (6) the extent to which its value to the community is outweighed by its dangerous attributes.  *Anchor v. Diaz Intermediates Corp.*, No. 04-CV-0300, 2011 WL 13213549, at *6 (W.D.N.Y. Mar. 14, 2011) (citing *Doundoulakis*, 42 N.Y.2d at 448).  Whether an activity is abnormally dangerous and warrants imposition of strict liability is a question for the court to decide.  *Abbatiello v. Monsanto Co.*, 522 F. Supp.2d 524, 531 (S.D.N.Y. 2007).

Plaintiffs have not alleged facts showing that defendants engaged in abnormally dangerous activity. The complaint alleges that many years ago, Corning deposited fill containing ash, brick and glass waste, which has since been found to contain certain hazardous substances.

There is no support in the case law, or in the factual allegations of the complaint, to support an inference that Corning's disposal of these industrial wastes was "abnormally dangerous," as that term has been construed by the courts. Based on the allegations of the complaint itself, the materials in question were not obviously, inherently dangerous; on the contrary, the fill consisted of substances that were outwardly ordinary. Courts have repeatedly held that the disposal of such substances, even if they do contain hazardous chemicals, is not so inherently dangerous as to give rise to strict liability. *See*, *e.g.*, *Outlet City, Inc. v. West Chem. Prods., Inc.*, 60 Fed.Appx. 922 (3d Cir. 2003) (affirming lower court's finding that manufacturer's use and storage of toxic chemicals was not an abnormally dangerous activity) (applying New York law); *Adkisson v. Jacobs Engineering Group, Inc.*, __ F.Supp.3d __, 2018 WL 4494101, at *13 and n.16 (E.D.Tenn. 2018) ("courts appear to agree that hazardous waste disposal or removal is not ultrahazardous or abnormally dangerous") (citing cases from various jurisdictions); *Modern Holdings, LLC v. Corning Inc.*, Civ. No. 13-405, 2015 WL 1481457, at *9 (E.D.Ky. Mar. 31, 2015) (dismissing strict-liability claim based on Corning's use, treatment and disposal of hazardous substances used in its manufacturing operations, and noting that "ultrahazardousness or abnormal dangerousness is, in the contemplation of the law at least, a property not of substances, but of activities") (quoting *Indiana Harbor Belt R.R. Co. v. American Cyanamid Co.*, 916 F.2d 1174, 1181 (7th Cir. 1990)).

## C. Private and Public Nuisance

Plaintiff's fourth and fifth causes of action assert claims for private and public nuisance, respectively.  Under New York law, "[t]he elements for public and private nuisance are generally the same."  *Cangemi v. United States*, 939 F.Supp.2d 188, 205 (E.D.N.Y. 2013).

To state a claim for private nuisance, "a plaintiff must allege: '(1) an interference substantial in nature; (2) intentional or negligent in origin; (3) unreasonable in character; (4) with plaintiff's right to use and enjoy land; (5) caused by defendant's conduct in acting or failing to act."  *Id.* at 203.  Likewise, for public nuisance, a plaintiff must allege:  (1) a substantial interference with a right common to the public; (2) negligent or intentional conduct or omissions by a defendant that create, contribute to, or maintain that public nuisance; and (3) particular harm suffered by the plaintiff, different in kind from that suffered by the community at large as a result of that public nuisance.  *Town of Islip v. Datre*, 245 F.Supp.3d 397, 428 (E.D.N.Y. 2017).

"The law of nuisance historically evolved as a means of resolving conflicts between neighboring contemporaneous land users."  *55 Motor Ave. Co. v. Liberty Indus. Finishing Corp.*, 885 F.Supp. 410, 421 (E.D.N.Y. 1994).  Thus, "[t]he offending condition does not exist on plaintiff's land but on defendant's land, and the injury must be to persons outside of the defendant's premises."  *Id.* (citations omitted).

In *55 Motor Ave.*, the court stated that "the law of nuisance cannot be expanded to permit recovery ... where current owners of property seek recovery against a prior lessee of the land for a condition created on the land during the lessee's tenancy."  The court noted that other courts "have consistently rejected the efforts of property owners who discover contamination on their properties to maintain private nuisance claims against the former owners or lessees.  In such

circumstances the offending condition is not present on the defendant's land and the conflict does not involve neighboring contemporaneous land uses." *Id. See also Nashua Corp. v. Norton Co.*, No. 90-CV-1351, 1997 WL 204904, at *3 (N.D.N.Y. Apr. 15, 1997) ("private nuisance does not provide a remedy to a subsequent owner of property for a nuisance created by a prior owner"). That common-law principle has been applied in other jurisdictions as well. *See*, *e.g.*, *Rolan v. Atlantic Richfield Co.*, 16-CV-357, 2017 WL 3191791, at *14 (N.D.Ind. July 26, 2017) (noting "a wealth of case authority from Indiana and other jurisdictions favorably citing the proposition that a subsequent user of contaminated property is barred from suing the prior owner" based on a theory of private nuisance) (citing cases).

In the case at bar, plaintiffs have alleged that defendants deposited certain materials, on property that plaintiffs eventually purchased, years later. Under the authority outlined above, that is insufficient to make out a claim of private nuisance.

Plaintiffs' public-nuisance claim fares no better. A public nuisance is "a substantial interference with the exercise of a common right of the public, thereby offending public morals, interfering with the use by the public of a public place or endangering or injuring the property, health, safety or comfort of a considerable number of persons." *Copart Indus. v. Consolidated Edison Co.*, 41 N.Y.2d 564, 568 (1977). "To prevail on a public nuisance claim under New York law, a plaintiff must show that the defendant's conduct amounts to a substantial interference with the exercise of a common right of the public, thereby endangering or injuring the property, health, safety or comfort of a considerable number of persons." *In re MTBE Products Liab. Litig.*, 725 F.3d 65, 121 (2d Cir. 2013) (internal quotations and citation omitted).

"A public nuisance is actionable by a private person only if it is shown that the person suffered special injury beyond that suffered by the community at large. This principle recognizes the necessity of guarding against the multiplicity of lawsuits that would follow if everyone were permitted to seek redress for a wrong common to the public." *532 Madison Ave. Gourmet Foods, Inc. v. Finlandia Ctr., Inc.*, 96 N.Y.2d 280, 292 (2001) (internal citations omitted). Thus, "where the claimed injury is common to the entire community, a private right of action is barred. The claimed injury must be different in kind from the entire community, not simply different in degree." *Booth v. Hanson Aggregates New York, Inc.*, 16 A.D.3d 1137, 1138 (4th Dep't 2005).

In their complaint, plaintiffs allege that defendants "have interfered with the rights common to all, including groundwater and public lands," and that plaintiffs "have sustained special damages from the public nuisance." Complaint ¶¶ 173, 174. But plaintiffs have not alleged any facts to support a finding of special injury or damages, as required for a public-nuisance claim. The recitation of the elements of a claim is not enough to satisfy federal pleading requirements. *See Acosta Orellana v. CropLife Int'l*, 711 F.Supp.2d 81, 101-02 (D.D.C. 2010) (dismissing a public-nuisance claim where "the plaintiffs merely recite[d] the elements of a public nuisance claim without providing any factual support for the allegation that a right common to the general public ha[d] been harmed, rendering the claim deficient").

Plaintiffs have not alleged facts supporting a finding of a public nuisance, or of special injury, so as to give rise to a private cause of action. *See Bano v. Union Carbide Corp.*, 198 Fed.Appx. 32, 34 (2d Cir. 2006) (plaintiff's claim for public nuisance based on alleged groundwater contamination failed because she did not allege any special injury or damages "beyond that of the general inconvenience to the public at large"); *Fitzgibbons v. City of Oswego*,

10-CV-1038, 2011 WL 6218208, at *15 (N.D.N.Y. Dec. 13, 2011) (noting that the plaintiff "[s]imply allege[d] that, by causing the contamination, the County Defendant interfered with the rights common to all, 'including ground and surface waters,' and that he ha[d] sustained special damages as a result of this public nuisance," and concluding that "[e]ven construed in the light most favorable to Plaintiff, there is nothing in the amended complaint that would allow the Court to make a determination that enough people were affected by this groundwater contamination for it to qualify as a public nuisance").

**D. Defendants' Motion to Stay CERCLA Damages Claims**

Defendants have moved for a stay of plaintiffs' claims for damages under CERCLA. That motion is granted.

Under CERCLA, a party covered by the statute is liable for certain costs and monetary damages resulting from a release of hazardous substances. *See* 42 U.S.C. § 9607(a)(4).[4]  The extent of plaintiffs' recoverable damages may be fodder for further litigation, but to allow plaintiffs' damages claims to go forward now would be obviously premature.

Plaintiffs' opposition to defendants' motion for a stay is based on their argument that the Court should reject defendants' primary-jurisdiction argument:  in other words, that the Court should not defer to the DEC's chosen remedy, but should order injunctive relief, and go from there, in assessing money damages.

---

[4] Though plaintiffs' claims for injunctive relief do not appear to be premised on CERCLA, the Court notes that CERCLA only allows the federal Environmental Protection Agency ("EPA") to seek injunctive relief; individual states and private parties are not entitled to seek an injunction. *See State of New York v. Shore Realty Corp.*, 759 F.2d 1032, 1049 (2d Cir.1985); *Wademan v. Concra*, 13 F.Supp.2d 295, 301 (N.D.N.Y. 1998).

As explained above, the Court has rejected the premise of that argument.  It would thus make no sense to attempt to calculate plaintiffs' money damages now, while the DEC-ordered remedial process is continuing.

Plaintiffs assert that they have incurred response costs that will not be affected or reduced by any future remedial efforts, such as costs for the retention of an environmental consultant, and measures to reduce their exposure to hazardous substances.  Complaint ¶ 142.  But to allow plaintiffs to pursue such claims now, while the remedial process moves forward, would accomplish little other than to dissect this case into piecemeal litigation, with consequent delay and multiplicitous appeals, and attendant attorney's fees.  *See Vernado v. Seibel*, No. 17-CV-2413, 2018 WL 6617946, at *3 (E.D.Cal. Dec. 18, 2018) (in general, "courts should grant a stay to avoid piecemeal litigation"); *see also Kaplan v. Kaplan*, 524 Fed.Appx. 547, 548 (11th Cir. 2013) (district court did not abuse its discretion by staying federal action, where parallel federal and state litigation would result in deleterious piecemeal litigation); *Meyers v. Franklin County Court of Common Pleas*, 23 Fed.Appx. 201, 206 (6th Cir. 2001) (finding that when claim for injunctive relief was dismissed due to *Younger* abstention, the proper course of action was to stay, rather than dismiss, the related damages claim).  It makes eminent sense to stay the claims for response costs and other damages until after the DEC-ordered remediation has been implemented.

**CONCLUSION**

Defendants' Motion to Dismiss and Stay (Dkt. #11) is granted.

Plaintiffs' second, third, fourth and fifth causes of action are dismissed in their entirety.

Plaintiffs' first cause of action, seeking response costs under the Comprehensive Environmental, Response, Compensation and Liability Act of 1980, are stayed, pending further order of this Court.

IT IS SO ORDERED.

_____
DAVID G. LARIMER
United States District Judge

Dated: Rochester, New York
       December 21, 2018.